UNITED STATES of America,
Appellant in No. 89–5510

v.

Gaetano VASTOLA, Appellant in
No. 89–5372

v.

Elias SAKA, Appellant in No. 89–5383.

Nos. 89–5372, 89–5383 and 89–5510.

United States Court of Appeals,
Third Circuit.

Submitted Pursuant to Third Circuit
Rule 12(6) Aug. 29, 1990.

Oct. 2, 1990.

Herold Price Fahringer, Diarmuid White, Michael Rosen, Joy Vastola, Lipsitz, Green, Fahringer, Roll, Schuller & James, New York City, for Gaetano Vastola.

Barry M. Fallick, Rochman, Platzer, Fallick & Rosmarin, New York City, for Elias Saka.

Michael Chertoff, U.S. Atty., Marion Percell, Asst. U.S. Atty., Newark, N.J., for the U.S.

Before GREENBERG, SCIRICA and SEITZ, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This case is before us on remand from the Supreme Court following our decision affirming the convictions of appellants Gaetano Vastola and Elias Saka for a RICO conspiracy offense under 18 U.S.C. § 1962(d) and related extortion offenses under 18 U.S.C. § 894. *United States v. Vastola*, 899 F.2d 211 (3d Cir.1990). In addition, we affirmed Saka's convictions for two substantive RICO offenses under 18 U.S.C. § 1962(c), and for mail, wire, bankruptcy, and insurance fraud, and reversed Vastola's conviction for a substantive RICO offense under 18 U.S.C. § 1962(c) due to insufficiency of the evidence regarding his participation in the collection of an unlawful debt. Finally, in an appeal brought by the government pursuant to 18 U.S.C. § 3731, we vacated the district court's grant of Vastola's motion for a judgment of acquittal on Count I of the superceding indictment charging him with a substantive RICO violation predicated upon a pattern of racketeering activity and remanded Vastola's case for resentencing.

Inasmuch as the history of this rather complex case is fully set forth in our reported opinion, we will refer the reader to that opinion for the facts of the case and will discuss only the circumstances surrounding the government's electronic surveillance of appellants' activities, as the questions before us on remand relate to the admissibility of certain wiretap evidence derived from that surveillance.

I. *Background*

Appellants Vastola and Saka originally were indicted along with 19 other defendants in a 114 count indictment charging a variety of crimes. By opinion and order dated September 1, 1987, the district court severed the case for separate trials, *United States v. Vastola*, 670 F.Supp. 1244, 1261 (D.N.J.1987), resulting in Vastola and Saka ultimately being jointly tried on a 26 count superceding indictment naming Vastola in 14 counts and Saka in 25 counts. As pertinent to this remand, the district court, at the time it ordered the severance, denied a pretrial motion, joined in by all of the original defendants, which sought the suppression of all wiretap evidence derived from the government's electronic surveillance of the Video Warehouse in West Long Branch, New Jersey. 670 F.Supp. at 1282. The evidence obtained from the West Long Branch surveillance was germane in the government's case against Vastola and Saka, as the Video Warehouse was the headquarters of their racketeering enterprise.

The circumstances leading to this motion may be traced to March 15, 1985, when the United States District Court for the District of New Jersey authorized the interception of wire and oral communications at the Video Warehouse in West Long Branch. The parties agree that the authorization was extended on April 16, 1985, and on May 14, 1985, with the second extension expiring on June 13, 1985, and that the interception in fact ceased on May 31, 1985, when the co-conspirators moved their operation to a new location in Neptune City, New Jersey. The surveillance generated approximately 185 reels of tape from March 15, 1985, to May 31, 1985, but the government did not immediately present them for judicial sealing, as required by section 2518 of Title III of the Omnibus

Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (hereinafter Wiretap Act).[1] Instead, on June 26, 1985, the government obtained authorization to engage in electronic surveillance of Video Warehouse at its new location.[2]

On July 15, 1985, while the order of June 26, 1985, was still in force, the government presented the 185 reels of tape from the West Long Branch, New Jersey, surveillance for sealing. App. at 188–89. It was later discovered that two of the 185 tapes sealed on July 15, 1985, were duplicate tapes which, due to a clerical error, had been stored with the original tapes. Accordingly, on August 19, 1986, the originals from which the duplicates had been made were presented for sealing to the district court which, finding that the government had provided a "satisfactory explanation for the delay in presenting [the] two reels for sealing," ordered them sealed. App. at 200.

In their pretrial motion before severance of Vastola's and Saka's case, the defendants argued that 183 of the tapes from the West Long Branch surveillance should be suppressed because of what the defendants perceived to be a 45 day delay in their sealing, and that the remaining two tapes which had been misplaced due to the clerical error should be suppressed because

of an 80 day sealing delay.[3] The 45 days were measured from May 31, 1985, when the interceptions ceased, until July 15, 1985 when the tapes were sealed. The district court rejected this argument on the basis of *United States v. Falcone,* 505 F.2d 478, 484 (3d Cir.1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975), which held that suppression is an appropriate remedy for a delay in sealing wiretap evidence only if it can be shown that the physical integrity of the tapes has been compromised. 670 F.Supp. at 1282. Because the defendants had not challenged their physical integrity, the district court concluded that suppression of the tapes was not mandated under the Wiretap Act. *Id.*[4] In our previous opinion, we summarily affirmed the district court's decision on this point, stating only the obvious conclusion that it "was fully consistent with *Falcone.*" 899 F.2d at 239 n. 33.

After severance of their cases, Vastola and Saka, in a pretrial motion, raised the additional contention that all of the wiretap evidence should be suppressed because the government violated the custody requirements of various unsealing orders when it sent the tapes to a private individual, Paul Ginsberg, for audio enhancement.[5] This issue first surfaced when Vastola and

---

1. Section 2518 provides in pertinent part that: The contents of any wire, oral or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device ... Immediately upon the expiration of the period of the [wiretap] order, or extensions thereof, *such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders.... The presence of the seal ... or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral or electronic communication* or evidence derived therefrom under subsection (3) of section 2517.
 18 U.S.C. § 2518(8)(a) (emphasis supplied).

2. The Neptune City surveillance was terminated on July 25, 1985, and the surveillance tapes were sealed on August 6, 1985. App. at 191–94. The appellants have not raised any arguments with respect to the 12 day delay in the sealing of the Neptune City tapes.

3. As appellants point out in their letter brief to this court, the sealing delay with respect to the final two reels from the West Long Branch surveillance was well over a year, as the original reels were sealed on August 19, 1986, not August 19, 1985. Letter Brief at 3 n. 1.

4. In what appears to be a typographical error, the district court's opinion indicates that the original interception order for the Video Warehouse surveillance was entered on March 25, 1985, rather than March 15, 1985. 670 F.Supp. at 1282.

5. In our previous opinion, we discussed at length the custody requirements of the unsealing orders and we will rely on that discussion herein. 899 F.2d at 237–39. We have set forth below certain additional facts regarding the proceedings before the district court which we did not have reason to address in our earlier opinion.

Saka, while preparing for their joint trial, discovered that Ginsberg had unsupervised custody of the tapes over a substantial period while he converted the reels to cassettes and enhanced their sound quality. App. at 234–36. In argument before the district court, the government insisted that it had fully complied with the custody requirements of the unsealing orders because it had maintained a strict chain-of-custody of the tapes covering the time they were in Ginsberg's possession. App. at 253, 257–58.[6] The government further argued that, in any event, the tapes should not be suppressed because the gravamen of Vastola's and Saka's argument was that there had been an unauthorized disclosure of the contents of the tapes to a private individual in violation of 18 U.S.C. § 2517, so that their only available remedy was a civil claim as provided in section 2520 of the Wiretap Act. App. at 251, 255–57.

Finally, the government suggested that suppression of the tapes would be unfair because it had them enhanced at the behest of other defendants charged in the original indictment whose cases had been tried before Vastola's and Saka's. In particular, the government argued that it sent the tapes to Ginsberg because, during the joint trial of Morris Levy, Dominick Canterino, and Howard Fisher, defense counsel complained about the audio quality of copies of the tapes the government had provided to them.[7] The attorney for the government, summarizing his argument on this point, said that:

[I]t isn't often you have a situation where you have seven succeeding trials and now that you're down the line that the defendants at the last trial will say, wait a minute, why were those unsealed and what were the procedures followed after the unsealing?

App. at 253.

He added that the tapes were sent to Ginsberg because it was not feasible in view of their enormous volume for the government to complete the enhancements in time for their use by the defendants at trial. App. at 253, 268–69.

In an unreported opinion, the district court denied suppression as it agreed with the government that the thrust of appellant's complaint was predicated on an unauthorized disclosure of the contents of the tapes for which suppression was not an available remedy. App. at 292–93. It further opined that the disclosure of the tapes to Ginsberg was incident to the government's trial preparation and thus was authorized by section 2517(2) of the Wiretap Act, which permits a government agent to "use" the contents of wiretap evidence "to the extent such use is appropriate to the proper performance of his official duties." 18 U.S.C. § 2517(2). Finally, the district court stated that there was no indication that Vastola and Saka had been prejudiced by the disclosure of the tapes to Ginsberg, as it appeared that the physical integrity of the original tapes was not affected in any manner by the enhancement process. App. at 294–95. The court indicated that it might reconsider the appellants' suppres-

**6.** In its Memorandum in Opposition to Defendants' Motion to Suppress the Tape Evidence, the government conceded that "there was a technical departure" from the unsealing procedure set forth in one of the unsealing orders. App. at 229.

**7.** The attorney for the government stated:
For trial purposes, particularly in the *Levy* trial situation, there were complaints by defense counsel in the *Levy* case that their copies were not very good. The originals had been unsealed. The originals had been unsealed for purposes of copying. We used the original and we made real [perhaps "reel"] time copies of that so that we would have the best available copy for the courtroom, meaning the jury could hear as clear to what was

on that tape as was possible under modern technology to make. This benefitted the defendants and in fact was requested by the defendants because they said that they, their copies were just garbled and they wanted better copies.
Each time they had a complaint about an individual conversation we took that conversation, we sent it to Paul Ginsberg under the strict procedures of accountability. We got it back and we sent the copy back onto the Levy defendants.
They stated publicly in this courtroom that those copies were far superior to theirs that, in fact, they introduced our courtroom copies as a defense exhibit.
App. at 254–55.

sion motion if it appeared at trial that the integrity of the tapes had been compromised, but concluded that on the facts before it, it had no reason to suppress the tapes. *Id.* at 295.

As we set forth in our previous opinion, at trial Ginsberg testified that the tapes remained in a locked storage container when he was not using them. Furthermore, he explained that "in the filtration process, there is no risk of alteration in the content of the enhanced copy, and that the original tapes are in no way modified." 899 F.2d at 239. Following Ginsberg's uncontroverted testimony, all of the tapes were admitted into evidence without further objection, app. at 507–08, on the understanding that the appellants reserved the right to challenge the government's use of individual tapes. App. at 530–31. It appears that at trial none of the tapes was suppressed on the basis of physical alterations made during the enhancement process.

On appeal to this court, appellants argued that, under section 2518(8)(a), the government's technical infraction of the custody requirements of the unsealing orders, standing alone, warranted the suppression of the tapes. 899 F.2d at 239. Appellants urged that the government's failure to comply strictly with the unsealing orders undercut the legislative intent of section 2518(8)(a) to ensure that the government has no opportunity to tamper with wiretap evidence. The government countered that section 2518(8)(a) furnishes a basis for the suppression of lawfully intercepted wiretap evidence only if there is no seal affixed to the tapes. 899 F.2d at 239–40. It maintained that its explanation for the absence of a judicial seal on the tapes was "satisfactory" because the tapes had been unsealed by court order. *Id.* In the alternative, it renewed its argument made before the district court that appellants' sole complaint was that there had been an unauthorized disclosure of the tapes' contents, conduct redressible only through a civil action under section 2520. *Id.* at 240 n. 36.

We rejected appellants' argument that the government's infraction of the custody requirements of the unsealing orders warranted the suppression of the wiretap evidence, but not for the reasons advanced by the district court and the government. We departed from the district court insofar as it characterized appellants' claim as a challenge to the unauthorized disclosure of the tapes' contents to a private individual because, in our view, the thrust of the claim was that failure to enforce strictly the unsealing orders could undermine the statutory safeguards against tampering which pervade Title III. 899 F.2d at 240 n. 36. We also rejected the government's argument that all lawfully intercepted wiretap evidence is admissible under section 2518(8)(a) if judicially sealed. This argument did not strike us as a plausible reading of the legislative intent underlying that section because, if followed, it would mean that all wiretap evidence would be admissible, regardless of whether it had been adulterated before sealing or after unsealing. While we recognized that Congress did not expressly define the government's responsibilities in handling tapes after their unsealing, to give full effect to the "overriding legislative concern ... to prevent the admission of wiretap evidence which has been subject to tampering," 899 F.2d at 240, we concluded that government uses of tapes after their unsealing which might compromise the physical integrity of the tapes should be analyzed in the same manner as sealing delays.

This much said, relying on *Falcone*, we upheld the district court's decision to admit the wiretap evidence, as there was no indication that the integrity of the tapes had been compromised during the enhancement process. *Id.* at 241. In reaching this conclusion, we were largely influenced by the fact that "compelling" and uncontroverted evidence had been presented that the enhancement process did not alter the contents of the tapes. *Id.* at 241–42. Accordingly, inasmuch as the Supreme Court had made clear in *United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974), that suppression is warranted only where there is noncompliance

with statutory requirements that " 'directly and substantially implement the congressional intention' " underlying Title III, we decided that the technical infraction of the custody requirements of the unsealing orders could not serve as a basis for suppression, as there was no indication that "the type of harm the statute was meant to prevent occurred" in this case. 899 F.2d at 242.

## II. *The Rios Decision*

By order dated June 25, 1990, the Supreme Court vacated our judgment and remanded the case to us for further consideration in light of *United States v. Rios*, —— U.S. ——, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990), which was decided after our opinion in *Vastola* was filed. —— U.S. ——, 110 S.Ct. at 3233, 111 L.Ed.2d 744. In *Rios,* the Supreme Court decided that the suppression of tapes derived from an authorized electronic surveillance is required where the government is unable to offer a "satisfactory explanation" for a delay in sealing the tapes in accordance with 25 U.S.C. § 2518(8)(a). In so holding, the Court expressly overruled *Falcone* and its progeny in other appellate courts. 110 S.Ct. at 1850 n. 5.

The facts of *Rios* were similar to those here insofar as the sealing delay is concerned. Effective April 27, 1984, the government originally obtained authorization to intercept communications at the defendant's residence in Levittown, Puerto Rico. Two extensions of the original order were granted, the second expiring on July 23, 1984. However, on July 9, 1984, the government terminated the surveillance because the defendant moved to a new residence in El Cortijo, Puerto Rico. 110 S.Ct. at 1848. On July 27, 1984, the government obtained a new surveillance order covering the El Cortijo residence which, after extensions, expired on September 24, 1984. After an additional surveillance order covering the defendant's car finally expired on October 10, 1984, the government, on October 13, 1984, had all of the tapes from the Levittown and El Cortijo residences judicially sealed. *Id.*

The Court of Appeals for the Second Circuit affirmed the district court's determination that the Levittown tapes were inadmissible because they should have been sealed at the latest on July 23, 1984, when the final extension order expired. *United States v. Ojeda Rios*, 875 F.2d 17, 22 (2d Cir.1989). The court rejected the government's threshold argument that the El Cortijo surveillance order was an extension of the Levittown order, reasoning that, under the Wiretap Act, an extension order must cover the same location as the original surveillance order. *Id.* It similarly rejected the government's suggestion that its mistaken belief that the sealing obligation did not arise until there was a lapse in the investigation as a whole constituted a "satisfactory explanation" for the sealing delay. In this regard, the court stated that "[t]he privacy and other interests affected by the electronic surveillance statutes are sufficiently important" to preclude the government from relying on a misunderstanding of the law as its explanation for a sealing delay. *Id.* at 23. Therefore, following its precedent that wiretap evidence may be suppressed on the basis of an unexplained sealing delay standing alone, *see United States v. Massino*, 784 F.2d 153, 156 (2d Cir.1986), the court affirmed.

The Supreme Court agreed with the Court of Appeal's reasoning insofar as it held that the government's satisfactory explanation for a substantial delay in sealing wiretap evidence is a precondition to its admissibility under section 2518(8)(a), regardless of whether the authenticity of the tapes has been challenged. In doing so, the Court explained that a "satisfactory explanation" for a sealing delay is required by the literal language of section 2518(8)(a), and that any other reading of the section would eviscerate the force of the sealing requirement as a safeguard against tampering. 110 S.Ct. at 1849–50. It rejected our interpretation of the sealing requirement in *Falcone,* namely that the evidence could be admitted upon proof of nontampering even where a sealing delay is not satisfactorily explained, as inconsistent with the unambiguous language of the statute stating:

It is true that offering to prove that tapes are authentic would be consistent with Congress's concern about tampering, but even if we were confident that tampering could always be easily detected, we would not be at liberty to agree with the Government, for it is obvious that Congress had another view when it imposed the sealing safeguard.

*Id.* at 1850 (footnote omitted).

Ultimately, however, the Court remanded the case for further factual inquiry into whether the government's asserted belief that it had no obligation to seal the tapes until the conclusion of its entire investigation was its actual reason for the sealing delay. The Court did not decide when the obligation to seal in fact arose but, instead, stated that in view of existing Second Circuit precedent at the time of sealing delay, the government's explanation was "objectively reasonable" and hence would suffice as a "satisfactory explanation" if it was the actual reason for the delay. *Id.* at 1851.

### III. *Discussion*

 We have invited the parties to submit letter briefs addressing the admissibility of the wiretap evidence in view of the *Rios* decision. After carefully considering these submissions, we conclude that the government's relinquishment of custody of the tapes for audio enhancement does not require their suppression, as *Rios* has no bearing on the admissibility of wiretap evidence allegedly mishandled by the government subsequent to its unsealing. However, we will not reinstate our judgment affirming appellants' convictions at this time but will remand this case to the district court to decide whether the government is now free, under *Rios*, to offer an explanation for its violation of the sealing requirement. If the district court determines that such an explanation may be given there will be further factual inquiry into the reason for the government's delay in sealing the West Long Branch tapes.

### A. *The Audio Enhancement*

Reading *Rios* and our prior decision together, appellants renew their argument that all of the tapes sent to Ginsberg for audio enhancement are subject to suppression. They believe that *Rios* significantly strengthens their position, as *Rios* characterized the sealing requirement in 18 U.S.C. § 2518(8)(a) as a "means of ensuring that ... the Government has no opportunity to tamper with, alter, or edit the conversations that have been recorded." 110 S.Ct. at 1849. In view of our decision that challenges to the government's physical treatment of tapes after their unsealing should be analyzed in the same manner as sealing delays, appellants conclude that the government's relinquishment of custody of the tapes requires their suppression solely because it heightened the risk of tampering. They argue that, after *Rios*, our ultimate conclusion that the tapes could not be suppressed because they were proven to be authentic no longer is viable. We disagree.

Whereas the result in *Rios* was compelled by the "plain words of the sealing provision," *id.* at 1850, here we are concerned with a statutory interstice, as Congress did not expressly define the government's responsibilities in handling tapes after their unsealing. 899 F.2d at 240. We adhere to our reasoning that in view of the elaborate scheme it devised to ensure the authenticity of wiretap evidence, Congress could not have been indifferent to the treatment of tapes after their unsealing. *Id.* But when we decided that the enhancement problem could be analyzed in the same manner as a sealing delay, we did so under the assumption that we were extending the *Falcone* standard then followed in this circuit to the situation before us.

As Judge Rosenn pointed out in his dissent in *Falcone*, the majority departed from the plain language of the statute and, in effect, adopted a "harmless error" analysis of sealing delays. 505 F.2d at 487 (Rosenn, J., dissenting).[8] In fact, it could

---

**8.** Judge Rosenn stated that:

Congress expressly selected a strict requirement that the tapes not be admitted into evi-

dence unless a satisfactory explanation is offered for a failure to seal them. Congress having expressly chosen a standard offering a

be argued that *Falcone* did no more than underscore the need for authentication of wiretap evidence in light of Congress's heightened concern about its physical integrity. Considering what *Falcone* actually held, namely that a sealing delay does not justify the suppression of wiretap evidence proven to be authentic, our extension of *Falcone* to situations arising after the judicial unsealing of the tapes was unremarkable. We held only that the legislative silence as to the admissibility of surveillance tapes after their unsealing does not imply that adulterated tapes may contribute to a criminal conviction and, therefore, the government must prove the tapes' integrity when confronted with a challenge to its physical treatment of them.

Notwithstanding our prior decision, we would not be justified in reading section 2518(8)(a) as a mandate that any post-unsealing use of wiretap evidence capable of compromising its physical integrity must be satisfactorily explained before authenticated evidence can be admitted.[9] As construed in *Rios*, Congress created in section 2518(8)(a) an extraordinary safeguard

against adulteration during the period between interception and trial. However, its failure to extend that remedy to post-unsealing situations was not necessarily an oversight. Possibly, Congress determined that the myriad uses which prosecutors legitimately could have for unsealed wiretap evidence would render it impractical to require judicial scrutiny of the prosecutor's motivation in each such instance. Furthermore, even in the case of judicially sealed tapes, violation of the *statutory* mandate that "custody of the recordings shall be wherever the judge orders," does not trigger the suppression remedy. 18 U.S.C. § 2518(8)(a). Considering this circumstance, we would be hard pressed to find that Congress required anything more than proof of authenticity where the custody requirements of unsealing orders technically have been violated.[10]

Moreover, even if we were to construe section 2518(8)(a) as appellants suggest, the government's relinquishment of custody of the tapes would not supply us with reason to order their suppression. Neither

---

significant protection to the citizen, I believe, in the language of *Giordano*, that the strict sealing requirement 'directly and substantially implements the congressional intention' of maintaining the integrity of the tapes. Therefore, it is my view that the majority is unjustified in creating an exception to the express language of § 2518(8)(a).
505 F.2d at 488.

**9.** Where there are statutory interstices in the sense that the statute's language does not explicitly resolve an issue which has arisen in the application of the statutory scheme, a court obviously has the power to decide the issue consistently with the legislative intent. *See, e.g., Stafford v. Briggs,* 444 U.S. 527, 535, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980) (deciding, in face of legislative silence, that the venue provision of the Mandamus and Venue Act of 1962, 28 U.S.C. § 1391(e), necessarily is limited to mandamus-type actions). However, the role we may legitimately play when fleshing out the details of an elaborate statutory scheme is a modest one. In this regard, we are guided by the Supreme Court's statement in *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), that:

In almost any statutory scheme, there may be a need for judicial interpretation of ambiguous or incomplete provisions. But the authority to construe a statute is fundamentally differ-

ent from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt. The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement.

*Id.* at 97, 101 S.Ct. at 1583–84 (citation omitted). *See generally Glus v. G.C. Murphy,* 629 F.2d 248, 259–65 (3d Cir.1980) (Sloviter, J., dissenting) (elaborating on the differences between the evolution of federal common law, judicial interpretation, and the judicial usurpation of legislative functions), *vacated and remanded sub nom. Retail, Wholesale and Dep't Store Union, AFL-CIO v. G.C. Murphy,* 451 U.S. 935, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981), *reversed in part on remand,* 654 F.2d 944 (3d Cir.1981). Here, it is highly questionable whether we may place greater limitations on the admissibility of unsealed wiretap evidence than the legislature expressly imposed.

**10.** We note our disagreement with *United States v. Riggi,* 737 F.Supp. 1410, 1415 (D.N.J.1990), which concluded that "it would be jurisprudentially myopic to hold that the Supreme Court's opinion in *Ojeda Rios* is limited to initial judicial sealing and precludes consideration of situations pertaining to judicial unsealing and resealing."

the statute nor *Rios* takes a *per se* approach to sealing delays nor, by implication, to unsealing problems. Rather they permit the government to defeat a suppression motion by proving the tapes' authenticity and by furnishing a satisfactory explanation for the statutory violation. The Court of Appeals for the First Circuit which, since *United States v. Mora,* 821 F.2d 860, 867–68 (1st Cir.1987), has followed the construction of the sealing provision adopted in *Rios,* held in *United States v. Angiulo,* 847 F.2d 956 (1st Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988),[11] that:

> If the unsealing of such tapes is challenged in a motion to suppress, the government should be required to prove (1) that the unsealing and use of the tapes did not result in alterations or tampering and (2) that the circumstances necessitating unsealing were not manufactured for tactical gain and that the defendants will not be unduly prejudiced as a result of the unsealing.

*Id.* at 978.

The *Angiulo* standard is readily satisfied here. As we found in our prior decision, Ginsberg's testimony supplied ample proof that the physical integrity of the tapes remained pure. 899 F.2d at 241–42. While the district court made no specific finding of fact on this point,[12] there can be no doubt as to the sufficiency of the government's factually unchallenged explanation that it sent the tapes to Ginsberg's firm because of the exigencies of the *Levy* trial, as it could not have completed the enhance-ments in time for them to be of use to the defendants had it relied on its own facilities. The events which necessitated the enhancements hardly could be said to have been "manufactured" by the prosecutors "for tactical gain." To the contrary, in the context of a multi-defendant case which has been severed for successive trials, it would be grossly unfair to the government to hold that audio enhancements performed for the benefit of one set of defendants could be the basis for suppression of the wiretap evidence in succeeding trials.[13] Accordingly, we reject appellants' contentions regarding the enhancement of the surveillance tapes.

## B. *The Sealing Delay*

Having determined we cannot justify the broader relief sought by appellants, that is, the suppression of all of the enhanced wiretap evidence, we must consider their more particularized contention that, in light of *Rios,* the West Long Branch tapes were subject to suppression because of the unexplained sealing delay.

The government advances several arguments why appellants' convictions should be reinstated notwithstanding *Rios* and the demise of *Falcone.* First, it submits that no sealing delay occurred because the order of June 26, 1985, authorizing electronic surveillance at Video Warehouse's new location in Neptune City, New Jersey, was an extension of the original authorization for the West Long Branch surveillance and its accompanying extensions, so that its obli-

---

11. *Angiulo* is especially pertinent because it involved a challenge to the unsealing of tapes for audio enhancement. 847 F.2d at 976. Of course, this case is one step further removed from the statute, as here, appellants do not challenge the propriety of the unsealing orders themselves, but focus on Ginsberg's enhancement of the tapes subsequent to their unsealing.

We acknowledge that with respect to certain New Jersey state tapes, appellants do contest the fact of unsealing. Letter Brief at 9 n. 9. We reiterate our observation that the government's "technical infraction" of the unsealing orders for those tapes, namely that they be unsealed in the presence of a federal district court judge, "does not negate the fact that the unsealing orders were entered and executed." 899 F.2d at 211 n. 34.

12. Although the district judge did not address this issue in his opinion, he did preside over the *Levy* trial and during the government's argument, he indicated that he recalled the dispute over the audio quality of the tapes. App. at 255a.

13. We are not to be understood as suggesting that after severance, representations made by defendants in an earlier trial are binding on defendants in a later trial. However, in the problem before us, our focus must be on the government's reasons for sending the wiretap evidence to a private individual for enhancement.

gation to present the tapes for sealing did not arise until the conclusion of the Neptune City surveillance. Second, relying largely on *Rios*, it argues that even if the the June 26, 1985, order could not be characterized as an extension order, the supervising attorneys, based on precedent at the time of the surveillance, reasonably believed that the sealing obligation would arise at the conclusion of the entire Video Warehouse investigation. Thus, we should find that the government has furnished a "satisfactory explanation" for the delay. Seemingly in the alternative, the government maintains that resolution of the sealing question is not necessary because even if the tapes covering the West Long Branch surveillance were suppressed, there would be sufficient evidence to sustain Vastola's and Saka's convictions on practically all counts. Accordingly, in the government's view, the admission of the tapes was at worst, harmless error. Finally, the government suggests that we remand for further factual inquiry into the reason for the sealing delay if we find that we cannot reinstate our opinion affirming appellants' convictions at this juncture.[14]

■ We agree with the government that the matter should be remanded to the district court. But we cannot accept its argument that our original judgment should now be reinstated. We could not possibly hold that the Neptune City interception order was an extension of the West Long Branch order. Although the government rightly points out that *Rios* did not decide whether a change in the location of an illegal operation will prevent a subsequent order covering the new location from being an extension of a previous order, the statute unambiguously rules out this possibility.[15]

Section 2518(1)(b)(ii) plainly states that an application for a surveillance order must contain "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted." In addition, section 2518(3)(d) requires a particularized showing of probable cause that "the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in the commission of [the] offense [under investigation]." Based on these two provisions alone, we would have no difficulty concluding that Congress intended for interception orders, and their accompanying extensions, to apply only to surveillances in the particular locations specified in the applications.

Moreover, even if we felt that subsections (1)(b)(ii) and (3)(d) of section 2518 were susceptible to a different interpretation, we would still reject the government's argument, as we agree with the Court of Appeals' statement in *Ojeda Rios*, 875 F.2d at 22, that section 2518(11), added to Title III as part of the Electronic Communications Privacy Act of 1986, § 106(d)(3), Pub. L.No. 99–508, 100 Stat. 1848, 1857, *reprinted in* 1986 U.S.Code Cong. & Admin.News, eliminates all room for argument on this point. Section 2518(11) provides for roving surveillances of wire or electronic communications upon a showing of the suspect's "purpose" "to thwart interception by changing facilities." Section 2518(11) further states that if the preconditions for a roving surveillance are met, then "the requirements of subsections (1)(b)(ii) and (3)(d) ... relating to the specifications of the facilities from which, or the place where, the communication is to be intercepted do not apply." The unmistakable inference from the language of subsection (11) is that before its inclusion in section

---

**14.** Appellants rigorously contest each of these assertions. We will address their arguments in the course of our discussion.

**15.** Curiously enough, in arguing that the Neptune City order was an extension of the West Long Branch order, the government relies on *United States v. Vazquez,* 605 F.2d 1269, 1278 (2d Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979), which, in its view,

stands for the proposition that the term, "extension," encompasses all continuations of wiretap orders involving the same crimes and substantially the same persons. We would be hard pressed to read *Vazquez* so broadly, as the Court of Appeals itself expressly rejected that interpretation of the case in *Ojeda Rios,* 875 F.2d at 21–22.

2518, subsections (1)(b)(ii) and (3)(d) restricted surveillances to particular locations, regardless of whether the same suspects and crimes were involved.

■ We conclude that a sealing delay indeed occurred as the West Long Branch tapes should have been sealed either as soon as was practical after May 31, 1985, when the actual surveillance ended, or as soon as practical after June 13, 1985, when the final extension order expired.[16] Furthermore, we cannot now on the record before us accept the government's suggestion that, even if erroneous, the supervising attorneys' reasonable belief that the order of June 26, 1985, extended the original interception order satisfactorily explains the delay.[17] Appellants understandably protest that the government's belated explanation not only is unsupported by the record but contradicts its specific assertions to this court and the district court that a delay occurred but that, under *Falcone*, it could not serve as a basis for suppression because the physical integrity of the tapes remained pure. They argue that government cannot now change its position and assert that it operated under the assumption that the Neptune City order extended the original order.[18] *See Steagald v. United States*, 451 U.S. 204, 208, 101 S.Ct. 1642, 1646, 68 L.Ed.2d 38 (1981) ("The government, however, may lose its right to raise factual issues ... when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation.").

Although we do not at this time accept the government's explanation for the delay, we find that its failure in the district court to offer evidence concerning the circumstances of the sealing delay should not necessarily now foreclose it from offering such evidence before the district court. We acknowledge that the circumstances of this case differ slightly from *Rios* because there the government seems to have offered some explanation for the delay at trial, though a question as to whether it had shifted its position on appeal remained. Here, however, the government relied under *Falcone* on the physical integrity of the tapes.

We do not consider this difference between the two cases to be significant on

---

**16.** The government argues that the length of the sealing delay should be measured from June 13, 1985, when the final extension order expired. There is certainly support for that position as the statute states that the government's sealing obligation arises "[i]mmediately upon the expiration of the period of the order, or extensions thereof ..." 18 U.S.C. § 2518(8)(a). *See United States v. Harvey*, 560 F.Supp. 1040, 1057 (S.D. Fla.1982), *aff'd*, 789 F.2d 1492 (11th Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 192, 93 L.Ed.2d 124 (1986) ("Case law clearly holds that the tapes do not have to be sealed until the end of the extension orders, i.e., at the termination of the entire surveillance."). Furthermore the Supreme Court in *Rios* read section 2518(8)(a) literally. We also observe that it might not be clear that a surveillance has ended as an interruption could be viewed at the time only as a hiatus. There is, however, a basis to support appellants' contention that there should have been sealing as soon as practical after the surveillance ended. Section 2518(5) seems pertinent to situations where a surveillance terminates before expiration of the final interception order, and it provides that "[n]o order entered under this section may authorize or approve the interception of any wire, oral, or electronic communication for any period longer than is necessary to achieve the objective of the authorization...." Furthermore, the legislative history indicates that: "The period of authorized interception is intended to begin when the interception—in fact—begins and terminates when the interception—in fact—terminates." S.Rep. No. 1097, 90th Cong., 2d Sess. 107, *reprinted in* 1968 U.S.Code Cong. & Admin.News, at 2112, 2192. Here we need not resolve the issue as even taking the June 13, 1985, date it cannot be said that the tapes were made available to the judge "immediately" upon the expiration of the period of the order.

**17.** With respect to the two reels of tape which were sealed on August 19, 1986, we accept the district court's finding that the government's clerical error in storing the original tapes constituted a satisfactory explanation for the delay. Accordingly, we will not further consider the implications of the additional delay in the sealing of those two reels.

**18.** We note that in *Rios*, Justices O'Connor and Blackmun joined the majority opinion on the understanding that it held that any explanation for a sealing delay must be the "actual reason" for the delay, rather than a "reasonable explanation" offered on appeal. 110 S.Ct. at 1851–52 (O'Connor, J., concurring, joined by Blackmun, J.). Without these votes, *Rios* may have been a plurality decision, as three justices dissented.

the issue of whether the government should now be able to explain the delay in the district court. *Rios* arose in the Second Circuit which, since *United States v. Gigante*, 538 F.2d 502, 505 (2d Cir.1976), has held that the government must prove a satisfactory explanation for a sealing delay before wiretap evidence may be admitted over a defendant's objection. In this case, while it is possible that the government offered no explanation for the delay because it had none, it is also possible that, acting in reasonable reliance on *Falcone*, it assumed that it could defeat the suppression motion by demonstrating the integrity of the tapes and thus did not find it necessary to introduce evidence on this point. Accordingly, we conclude that the district court should be entitled to exercise its discretion to decide whether the government should now be permitted, under *Rios*, to offer an explanation for its violation of the sealing requirement. It seems to us that this threshold determination should be made by the district court rather than by us as the nature of the determination is similar to that on a ruling on a motion by the government to reopen, traditionally a discretionary matter for the district court. *See United States v. Blankenship*, 775 F.2d 735, 740–41 (6th Cir.1985).

While we are remanding the matter we think it appropriate to comment on the appellants' argument that the government could not reasonably rely on *Falcone* because that case's continued viability was questionable at the time of trial in light of intervening precedent. We do not agree. To be sure, before *Rios*, the Courts of Appeals for the First and Second Circuits had followed the literal construction of section 2518(8)(a) adopted by the Supreme Court. *United States v. Mora*, 821 F.2d at 864–65; *United States v. Massino*, 784 F.2d at 156. However, several other courts of appeals agreed with our holding in *Fal-*

*cone* that lawfully intercepted wiretap evidence could not be suppressed on the basis of a sealing delay if the tapes were proven to be authentic. *United States v. Angelini*, 565 F.2d 469, 473–74 (7th Cir.1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978); *United States v. Diadone*, 558 F.2d 775, 780 (5th Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *McMillan v. United States*, 558 F.2d 877, 878–79 (8th Cir.1977). Thus, the district court might conclude that it would not fairly characterize any reliance the government may have placed on *Falcone* as unreasonable, especially considering that the government correctly predicted that we would adhere to that decision.

We have not overlooked the appellants' complaint that the government, in arguing that it reasonably believed it had an extension, already has proffered an explanation for the delay and should not be allowed a second bite at the apple before the district court. However, we do not think that the district court is necessarily compelled to conclude that a waiver would be appropriate in this case, as the government first advanced its explanation in the same submission in which it asserted a need for further factual inquiry into the reason for the delay. We emphasize, however, that upon remand, if the district court permits the explanation of the sealing delay to be given, the government must prove to the court's satisfaction the *actual* reason for the sealing delay. This would require a formal hearing in which the government corroborates its arguments to the district court through authenticated records produced at the time of the sealing delay, the testimony of individuals who participated in the interceptions, or other competent evidence.

In view of our decision to remand this case, we do not reach the question of whether the admission of the West Long Branch tapes could be considered harmless error.[19] We realize, of course, that if we concluded that a high probability exists

19. Appellants have raised the additional contention that if the West Long Branch tapes are suppressed, it will be necessary to reconsider the admissibility of other wiretap evidence presented in this case, as information derived from the West Long Branch tapes was used, in part, to establish probable cause for subsequent surveillances. We have located only one case which squarely addresses this issue, and it holds that lawfully intercepted conversations may be used to establish probable cause for an electronic surveillance, regardless of whether the conversations are themselves inadmissible because of an unexplained sealing delay. *United States v. Fury*, 554 F.2d 522, 531–32 (2d Cir.1977), *cert.*

that the evidence in the tapes did not contribute to appellants' convictions, we could save judicial resources by reinstating our opinion affirming appellants' convictions, thus obviating the need for a hearing. *See United States v. Jannotti*, 729 F.2d 213, 219–20 n. 2 (3d Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984) (defining the "high probability" standard of appellate review used to determine the harmlessness of nonconstitutional errors in the admission of evidence); *Government of the Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir.1976). However, if the tapes should have been suppressed, the extent of the damage to the government's case could not easily be assessed, as suppression of the tapes would remove the basis for certain other evidence presented in this case, such as Sergeant Robert Jones' explanation of loansharking terms used in the intercepted conversations. App. at 694–95, 733–34.[20] Considering that a possibility exists that the sealing delay will be satisfactorily explained, we think it best not to pass judgment on the murkier question of the harmlessness of the purported error. If necessary that issue may be reached on the remand.

### IV. *Conclusion*

In view of the foregoing, we will remand Vastola's and Saka's cases to the district court for further proceedings in light of *United States v. Rios* and this opinion.

*denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978). *Cf. United States v. Donlan*, 825 F.2d 653 (2d Cir.1987) (section 2518(8)(a) does not bar the admission of evidence obtained through a search made on the basis of statements set forth in untimely sealed surveillance tapes). However, we acknowledge that different interpretations of the statute are possible and express no opinion on the issue at this time as it would be premature to do so. Indeed, depending upon the results on the remand, it is possible that the issue may never have to be met.

20. Sergeant Jones, testifying as an expert, interpreted statements made by Vastola and co-con-

spirator Sonny Brocco in a April 26, 1985, conversation that they could "put it out for two" or "for three," app. at 3385, to be "terms used in loanshark loans" for percentage points. App. at 734. He construed Vastola's statement in a April 5, 1985 conversation at the Video Warehouse that "[e]verybody that I okay to Rudy for money is fuckin' up cause they think they got me as a buffer," app. at 3356, to mean, "we okayed them to Rudolph Farone for loanshark[ing]." App. at 695. In all, Jones' direct testimony regarding the contents of the West Long Branch tapes spanned approximately 100 pages of transcript. App. at 642–743.