**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2948
_____

UNITED STATES OF AMERICA

v.

MIKEL D. JONES;
DONA NICHOLS JONES,
                                        Appellants
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Crim. No. 11-cr-00261-001 and 11-cr-00261-002)
District Judge:  Honorable Berle M. Schiller
_____

Submitted Under Third Circuit LAR 34.1(a)
October 11, 2013
_____

Before: FUENTES, COWEN and BARRY, Circuit Judges

(Opinion Filed: October 31, 2013 )
_____

OPINION
_____

BARRY, Circuit Judge

Mikel Jones and his wife, Dona Nichols Jones, were convicted of conspiracy to

defraud and various counts of wire fraud, mail fraud, and money laundering, in

connection with their use of a line of credit extended by Stillwater Holdings, LLC

("Stillwater") to the Mikel Jones Law Firm to fund hundreds of thousands of dollars of personal expenses.[1] Mikel Jones was sentenced to 42 months in prison and ordered to pay $457,743.75 in restitution. Dona Jones was sentenced to one day in prison and restitution of $358,995. They now appeal.

On appeal, the Joneses claim that the evidence was insufficient to support their convictions and that the District Court erred in three respects: (1) in denying their motion to reopen the evidence; (2) by allowing testimony about Mikel Jones' commingling of personal and client funds; and (3) under Bruton v. United States, 391 U.S. 123 (1968), by allowing federal agents to testify about out-of-court statements each of the Joneses made about the other's role in the scheme to defraud. We will affirm.[2]

## I. Background

We write primarily for the parties and thus we need only briefly set forth the relevant facts. In February of 2006, Mikel Jones obtained a $750,000 line of credit from Stillwater to finance his law firm's "working capital." Under the arrangement, Jones was to submit an operating budget for Stillwater's approval, use the borrowed funds accordingly, and repay any outstanding debt by a maturity date of February 2008.

In the months to come, the law firm underperformed. Stillwater increased the line of credit and extended the maturity date to June 2008, conditioned on the firm's hiring

---

[1] The indictment also alleged a separate scheme to defraud the Philadelphia Commercial Development Corporation. The Joneses were acquitted of this alleged fraud, and it is not at issue before us.

[2] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. § 1291.

2

Jeffrey Dubin, a financial advisor, to discipline its spending. Dubin controlled the account containing the borrowed funds and authorized disbursements only when consistent with the Stillwater-approved budget. By June 2008, Jones remained unable to repay the debt. Despite its concern that the borrowed funds were being misspent, Stillwater continued to finance the law firm, hoping that settlements of outstanding cases would bring in revenue.

Stillwater's concern was well-placed. From February 2008 to January 2009, the Joneses used the borrowed funds to purchase sporting tickets and cover other personal expenses. To obtain payment, Mikel Jones submitted a misleading budget to Stillwater, documenting, as advertising expenses, roughly $20,000 in monthly payments to Comcast-Spectator, a sporting ticket vendor, and Strata-Tech, Inc., an inactive Florida corporation the Joneses controlled. He directed an employee to prepare false invoices from Comcast-Spectator and Strata-Tech, ostensibly for advertising services, and submitted them to Dubin. Dubin dutifully paid the invoices, issuing a total of $137,665 in checks to Comcast-Spectator (or to Jones personally, as reimbursement), and $146,995 to Strata-Tech. The checks to Comcast-Spectator paid for 76ers tickets; Dona Jones used most of the Strata-Tech funds to pay her personal credit card bills.

Later in 2009, the firm was expecting to receive a large fee from a settlement. Stillwater informed Mikel Jones that it would collect the entire fee to partially satisfy the law firm's outstanding debt. Jones asked to retain $160,000 so he could repay a creditor from "the street" who would harm Jones if he defaulted, and Stillwater agreed. The vast

3

majority of that $160,000 took a circuitous route to the law firm's trust account, restoring client funds Mikel Jones had previously withdrawn.

## II. Discussion

### A. Sufficiency of the Evidence

We apply a "particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence." United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998). Viewing the evidence in the light most favorable to the government, we must sustain a jury's verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.

### 1. The Fraud and Conspiracy Counts

The Joneses deny that they defrauded Stillwater. They claim that all of the disputed payments covered legitimate firm expenses: the sporting tickets secured business from prospective clients, and the various personal expenses constituted permissible "draws" from firm income to which Mikel Jones was entitled as the firm's owner. Dona Jones argues that her "role was very limited and clearly in the category of a supportive wife." Appellants' Br. at 74.

The government presented ample evidence to the contrary. The 2006 line of credit agreement limited use of the funds to "working capital," which included neither personal expenses, nor hundreds of thousands of dollars in sporting tickets. Brian Spira, an agent of Stillwater who arranged and monitored the deal, confirmed that understanding. Mikel Jones' own efforts to obscure the intended use of the funds corroborated it: Jones

4

documented the payments as advertising expenses in the 2008 budget, directed his employees to prepare false invoices, and concealed his control of Strata-Tech.

The government also demonstrated that Dona Jones knew the borrowed funds were only intended to cover the law firm's operating expenses: Spira testified that he told her so, and that he expressed his concern that the money was being misspent. Nonetheless, Dona Jones instructed Dubin's staff to mail Strata-Tech checks to the Joneses' Florida home and used the proceeds to pay her personal credit card bills.

The Joneses point to evidence that, contrary to Spira's testimony, Stillwater in fact expected its funds to be used to purchase sporting tickets: in his 2006 loan application to Stillwater, Mikel Jones attached a copy of his firm's 2005 budget, which included two line items for "Philadelphia Eagles" and "Philadelphia 76ers" under "annual promotional expenses." A1262. Whatever inference the jury could have drawn from that document regarding the events it was considering that took place three years later, and under a different budget, is not for us to say. We are required only to decide, under the standard of review set forth above, whether the evidence sufficiently supports a conclusion of guilt. It surely does. The jury could reasonably have concluded that Mikel Jones misrepresented the intended use of the funds in order to induce approvals to disburse those funds to him, and that Dona Jones was aware of, benefited from, and actively participated in the scheme with Mikel.

### 2.    Money Laundering

Along the same lines, appellants contend that "the law firm of Mr. Jones could do

what it wanted" with the $160,000 in settlement proceeds that forms the core of the money laundering count. Appellants' Br. at 76. Thus, they argue that the government failed to prove that the money laundering transactions involved "proceeds of specified unlawful activity," as it must to sustain a conviction under 18 U.S.C. § 1956.

A reasonable juror could conclude that Mikel Jones obtained the $160,000 fraudulently. The settlement proceeds were held in the law firm's operating account, which Jones could only access through Dubin. Dubin testified that he controlled the account on behalf of Stillwater, an unsurprising fact given that Jones had accrued over $2 million in debt and was struggling to repay it. And when Jones asked Dubin for the $160,000 check, Stillwater made clear that it would have called on the full amount of the settlement proceeds and only agreed to allow Jones to retain the $160,000 because of his claimed need to repay a debt from "the street." Jones did not repay a debt from "the street"; he, instead, replenished client funds in his law firm's trust account. Thus, Jones' misrepresentation induced Dubin to disburse the funds and Stillwater to forbear from collecting them.

### B. Motion to Reopen the Evidence

The Joneses challenge the District Court's denial of their motion to reopen the evidence, after deliberations had begun, to introduce a July 2006 email that had been turned over as discovery but overlooked by counsel.

Decisions to reopen are "traditionally a discretionary matter for the district court," United States v. Vastola, 915 F.2d 865, 876 (3d Cir. 1990), which "should be extremely

6

reluctant to grant reopening," United States v. Kithcart, 218 F.3d 213, 219 (3d Cir. 2000).

We review for abuse of discretion. Prejudice to the party opposing the motion, and the moving party's explanation for failing to present the evidence earlier, are salient considerations on a motion to reopen. United States v. Coward, 296 F.3d 176, 181 (3d Cir. 2002).

In the email, Mikel Jones provided Spira a breakdown of how he planned to spend a $75,000 draw from the line of credit. The breakdown included a $7,000 expense for a remaining balance on a Philadelphia Eagles season ticket contract. Spira appears to have approved the expense, as he issued a $75,000 check to the law firm the next day.

The Joneses claim that the email proves Spira perjured himself when he testified that he would never have approved using Stillwater funds to cover sporting ticket expenses:

> Q: Okay, did [Mikel Jones] tell you he intended to use the fund to purchase any tickets?
> A: No.
> Q: What about using funds to promote a sport events, in any fashion, to help the law firm?
> A: No.
>                        *        *        *
>
> Q: Would you have approved line of credit funds going for the purchase of basketball tickets?
> A: No.
> Q: Why not?
> A: Because those funds don't count as working capital of a firm. They don't advance cases, they don't pay expenses, they don't pay overhead.

A404, 423.

7

The July 2006 email could have been useful to the Joneses. Counsel could have questioned Spira about it and how, if at all, he could reconcile the above testimony with his past approval of sporting ticket expenses.

Nonetheless, the District Court properly denied the motion. As useful as the email may have been to appellants, it was hardly a game-changer. In the email, Jones made sure to frame his request for the season ticket payment as an exception to what Stillwater would generally authorize. He described the season ticket contract as a relic from when his "original partners were involved" and noted that he needed to make the payment to avoid forfeiting a $50,000 deposit. A129.

The fact that Spira had once approved a modest sporting ticket expense as an exception to the ordinary course of the law firm's spending hardly provides conclusive evidence that he would have expected such payments to be made routinely as "advertising expenses" years later, in much higher amounts, and with no explicit accounting for them in the firm's budget. Indeed, the apparent need for Jones in his email to justify the payment as an extenuating circumstance only supports Spira's general testimony regarding the permissible uses of Stillwater funds. The email's appeal to the defense was, therefore, largely superficial, a fact that could have been easily lost on a jury called upon to consider it in the midst of deliberations. The District Court did not abuse its discretion when it denied the motion to reopen.

### C. Testimony About Mikel Jones' Commingling of Funds

At trial, the government examined a tax and estate lawyer who worked with Mikel

Jones about money Jones removed from his law firm's trust account. The witness noted that such commingling of client and personal funds violated the rules of professional ethics. The Joneses had moved before trial to exclude this evidence and now challenge the District Court's denial of that motion. We review for abuse of discretion. See United States v. Serafini, 233 F.3d 758, 768 (3d Cir. 2000).

The Joneses argue that the testimony "was irrelevant," "tainted Mr. Jones before the jury as an unethical lawyer," and should have been excluded as impermissible character evidence. Appellants' Br. at 65, 66. However, evidence of uncharged bad acts may be admitted to prove motive. See Fed. R. Evid. 404(b)(2). Jones used the $160,000 in retained settlement funds to replenish his firm's trust account, from which he had withdrawn roughly $150,000. Thus, the disputed testimony, which documented the shortfall in the trust account and described the professional consequences of allowing the lapse to continue, was direct evidence of Jones' motive in defrauding Stillwater out of the settlement funds it sought to collect.

### D. Bruton

Neither Mikel nor Dona Jones testified at trial. However, two federal agents testified about their interviews with both of them, recounting statements by each of them concerning the conduct of the other. The Joneses argue that this testimony violated their right to confront their accuser under Bruton v. United States, 391 U.S. 123 (1968). Bruton, and subsequent cases clarifying it, forbid the "introduction of a non-testifying defendant's out-of-court statement, which directly implicates a co-defendant by name."

9

United States v. Hardwick, 544 F.3d 565, 572 (3d Cir. 2008).

Because appellants never raised a Bruton objection in the District Court, we review for plain error, and will "correct only particularly egregious errors" that affect "substantial rights" and "seriously affect the fairness, integrity or public reputation of judicial proceedings." United States v. Richards, 241 F.3d 335, 341 (3d Cir. 2001) (internal quotation marks omitted).

Much of the agents' testimony concerned out-of-court statements that each defendant made about his or her own role in the scheme. The only statements by one defendant that even mentioned the other concerned banal and undisputed factual issues. Dona Jones stated that Mikel started his law firm seven years prior to her interview, that she and Mikel established Strata-Tech together, and that they both participated in the financial management of the law firm. Mikel Jones said even less about Dona, revealing only that he did not know why Strata-Tech was registered in his wife's name.

At no point did the Joneses dispute their control of Strata-Tech, and, unsurprisingly, Mikel Jones never denied that he managed the finances of his law firm. Their defense was addressed solely to the use of Stillwater funds for sporting tickets and personal expenses. Given the immateriality of the only statements that could even arguably raise an issue under Bruton, there is no error, much less plain error, to correct.

### III. Conclusion

The judgments of sentence will be affirmed.